**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **Mark Hutton, Clear Meadow Investment LLC**<br><br><br>Plaintiffs,<br><br>v.<br><br>**Deutsche Bank AG, Deutsche Bank Securities Inc doing business as Deutsche Bank Alex Brown, a Division of Deutsche Bank Securities Inc, Clarion Capital, LLC, Clarion Capital Corporation Clarion Capital Holdings, LLC Serve:  Registered Agent, CF Advisors XXXVII, LLC, and Daniel Brooks, Jr.**<br><br>**and**<br><br>**Societe Generale**<br>**1221 Avenue of the Americas**<br>**New York, NY 10020**<br>**(return for service)**<br><br><br>Defendants. | Cause No. #: 2:07-cv-02041-JTM-KMH |

**AMENDED CLASS ACTION COMPLAINT**

COME NOW plaintiffs, Mark Hutton and Clear Meadow Investment LLC, on behalf of himself and all others similarly situated (hereinafter sometimes referred to as "Plaintiffs" and "the Class"), and for their amended complaint against Deutsche Bank AG, Deutsche Bank Securities Inc doing business as Deutsche Bank Alex Brown, a

Division of Deutsche Bank Securities Inc., Clarion Capital, LLC, Clarion Capital Corporation, Clarion Capital Holdings, LLC, CF Advisors XXXVII, LLC, and Daniel Brooks, Jr. (hereinafter "defendants") allege:

### Preliminary statement

1.      This is a civil class action brought on behalf of a Plaintiff Class consisting of all persons in the United States of America, who purchased from defendants sham tax shelters such as ML deposit, SON of BOSS, OPS, BOSS, BLIPS, MIDCO, FLIPS, OPIS, TRACT, IDV, CARDS, COBRA, and other similar Son of Boss tax shelters during the years 1997, 1998, 1999, 2000, 2001, 2002, and 2003.

2.      Plaintiffs bring this action, seeking compensatory damages, trebled under RICO and punitive damages, and related relief, against two investment firms, Deutsche Bank, and other related entities and individuals for their role in promoting over 19 tax strategies that the federal government has found to be unregistered tax shelters, including one dubbed market linked deposit, and inducing plaintiffs, including Mark Hutton, to utilize certain foreign currency market linked deposit ("ML deposit") strategy and file tax returns premised on the assumption that the strategy was lawful.  ML deposits like other Son of Boss tax strategies has been rejected by federal and state tax agencies, as the Defendants knew or should have known it would be.

3.      Plaintiffs allege claims under RICO, as well as claims for breach of fiduciary duty, inducing breach of fiduciary duty; fraud, negligent misrepresentations and professional malpractice, breach of contract constituting professional malpractice, declaratory relief, and seeking to recover unethical, excessive, and illegal fees.

4.      Plaintiff seeks damages for the fees they paid to defendants; the amount that Plaintiffs have paid and/or will pay a new set of advisors to rectify Defendants' self-serving, bogus tax reducing strategies; the taxes Plaintiffs have paid and may be assessed in the future that Defendants promised would be eliminated, and Defendants shall be liable to Plaintiffs for any additional amounts, including taxes, interest and penalties, that may be assessed against them by the Internal Revenue Service and state tax authorities or that Plaintiffs will pay in the future; damages resulting from hiring and paying substantial sums to additional tax and legal advisors to rectify Defendants' malfeasance and minimize the resulting harm injunctive relief under RICO and other claims; disgorgement of the fees charged by Defendants; plus compensation for other damages sustained; plus attorneys' fees and costs under RICO and other damages, including damages sustained from hiring attorneys to defend Plaintiffs from the I.R.S. and state tax authorities.

5.      On information and belief, in 1997 or 1998, the Defendants entered into an arrangement to market and promote at least 19 tax strategies, one of which was dubbed ML deposits, in order to generate huge fees.  The Defendants arranged for Deutsche Bank, among others, to identify and then solicit potential participants, like Mark Hutton, who were induced to engage in ML deposits and other transactions and pay the Defendants large fees by misrepresentations, financial advice, and legal advice that the Defendants knew or should have known was improper and incompetent.

6.      Among other things, the Defendants induced Mark Hutton and others  to engage in the ML deposits and other transactions by representing that the ML deposits tax strategies had been vetted by law firms, were lawful and conservative, and by

3

promising that the law firms would provide legal opinions attesting to that characterization and providing protection against penalties that the tax authorities could assess in the unlikely event they challenged the legitimacy of tax reductions from the ML deposits strategy.

7.      Defendants either knew or should have known from the outset that the ML deposits strategy is a tax shelter that would not pass muster with the IRS or state tax authorities.

8.      Defendants abused their position of trust by collecting fees for putting into effect a scheme to reduce the Plaintiffs' income taxes that all the Defendants knew or should have known would be regarded as a sham by the tax authorities.  Indeed, defendants used law firms such as Cantley & Sedeca, White & Case, Jenkens & Gilchrist and Brown & Wood to provide lengthy and detailed legal opinion letters confirming the propriety of the ML deposits scheme, in exchange for a large fee, calculated as a percentage of the paper losses created.  The Opinion Letters were issued after, and failed to seriously address, a 1999 IRS Notice ("1999 Notice") that rejected transactions substantially the same as that the Defendants were foisting on Mark Hutton, as well as a 1998 tax decision by the Third Circuit, ACM Partnership v. Commissioner, that rejected the reasoning of the Defendants in their canned opinion letters.

9.      Dan Brooks was a former employee of Deutsche Bank from 1996 until 2001, where he first developed these sham tax shelters such as ML deposit transactions and other Son of Boss-like transactions.  He sold these tax shelters as an employee of Deutsche Bank for Deutsche Bank.

10.     Dan Brooks left Deutsche Bank in 2001  Nevertheless, with the creation of the various Clarion defendants identified herein and the help of reputable law firms such as Cantley & Sedaca, Jenkens & Gilchrist and Brown & Wood, Dan Brooks, Deutsche Bank, and the other defendants identified herein continue to promote and sell these sham tax shelters such as ML deposit transactions and other Son of Boss-like transactions.

11.     Upon information and belief, Dan Brooks used the same facilities, employees of Deutsche Bank, forms, promotional information, his association with Deutsche Bank and other such Deutsche Bank resources as discovery will uncover when promoting and selling ML deposit transactions and other Son of Boss-like transactions.

12.     At all times identified in his complaint, Dan Brooks was the agent for Deutsche Bank and the other defendants identified herein.  When plaintiff agreed to enter this ML deposit transactions with Dan Brooks, he entered a transaction, unbeknownst to him, with Deutsche Bank on each side of the transaction, and with each of the other defendants already set to perform their part in this fraud as more fully set out herein.

13.     All defendants identified herein were agents and/or co-conspirators for each other, each having entered an agreement where there was a "meeting of the minds" of all defendants to sell fraudulent tax shelters while representing them as legitimate tax shelters to private individuals that would cost them millions of dollars in damages.  At all times each defendant knew that the subject ML deposit transactions was a fraud and intentionally concealed this fact from plaintiff through misrepresentations and omissions.

14.     The ML deposit transaction entered into by Mark Hutton was an absolute sham and did not involve securities.  It was not a securities-based transaction. Unbeknownst to plaintiff, the transaction itself was entirely a sham and existed only on

paper.  What is described in this complaint was, unbeknownst to plaintiff, a transaction that existed only on paper.

15.     ML Deposits are cash deposits similar to money markets or certificates of deposit.  ML Deposits contain two interest components--(1) a fixed rate of return component that is paid on the maturity date of the ML Deposits, and (2) a variable interest component that is paid on the maturity date if certain contingencies occur.  The contingency is determined by reference to a specific financial market measure such as a foreign currency.  Whether the contingency is satisfied is generally not known or determined until the maturity date.

16.     CLEARMEADOW LLC entered into a ML Deposit contract with Deutsch Bank or its agents, which constituted a deposit of 27,472,520 Eurodollars.  Under the terms of this ML Deposit contract, on December 14, 2001, Deutsch bank or its agent would be required to pay to CLEARMEADOW LLC an amount equal to the ML Deposit amount plus a fixed yield calculated at an annual rate of 3.67%, plus, a contingent variable yield calculated at an annual rate of 16%.  The variable yield was contingent upon the Japanese Yen/US Dollar spot market equal to or exceeding 124.65 on the maturity date.  CLEARMEADOW LLC paid a premium to Deutsch Bank or its agent to acquire this position in this ML Deposit equal to 2,747,252 Eurodollars.

17.     CLEARMEADOW LLC also entered into a short ML Deposit contract, in which it accepted a deposit of 27,472,520 Eurodollars from Deutsch Bank or its agent.  Under the terms of this short ML Deposit contract, on December 14, 2001, CLEARMEADOW LLC was required to pay to Deutsch Bank or its agent an amount equal to the ML Deposit amount plus a fixed yield calculated at an annual rate of 3.67%,

plus, a contingent variable yield calculated at an annual rate of 15.82%.  The variable yield was contingent upon the Japanese Yen/US Dollar spot market equal to 124.67 on the maturity date.

18.     Through these offsetting ML deposit contracts, CLEARMEADOW LLC would earn a modest investment return if the Japanese Yen/US dollar spot market was greater than or equal to 124.67 on the maturity date.  In addition, Deutsche Bank or its agents represented that CLEARMEADOW LLC purportedly stood to earn a 14,446% return on its ML deposit investments if the Japanese Yen/US dollar spot market was greater than or equal to 124.65 on the maturity date but less than 124.67.  However, upon information and belief, the Japanese Yen/US dollar spot market did not trade in increments small enough to fall within the range of 124.65 – 124.67.  Thus, the representation of Deutsche Bank or its agent that CLEARMEADOW LLC could potentially earn a 14,446% return was misleading and false.

## PARTIES

19.     Plaintiff Mark Hutton is an individual and citizen of the state of Kansas. He resided in Kansas during the relevant time periods and at the time of the filing of this Amended Complaint.

20.     On information and belief, Defendant Deutsche Bank AG is a leading international financial services conglomerate, with 13 million customers and 71,000 employees in 76 countries, including offices in New York.  On information and belief, Defendant Deutsche Bank AG is a foreign corporation organized and existing under the laws of Germany, with principal place of business in Germany, and with offices in New York, New York.

21.     On information and belief, Defendant Deutsche Bank Securities, Inc. d/b/a Deutsche Bank Alex Brown (together with Deutsche Bank AG, "Deutsche Bank") is a Delaware corporation with its principal place of business in New York, New York, and is a member of the New York Stock Exchange.

22.     On information and belief, Society General of New York is a corporation and a citizen of New York.  At all times mentioned herein, it is an agent of Deutsche Bank and is hereinafter referred to as "Deutsche Bank."

23.     Dan Brooks - upon information and belief- is a citizen of New York and Connecticut, and for reasons stated herein, is an agent of Deutsche Bank and the other defendants.

24.     Each of these tax strategies (OPS, BOSS, Son-of Boss, BLIPS, MIDCO, FLIPS, OPIS, TRACT, IDV, CARDS, ML deposits and COBRA) was the same as or substantially similar to "listed transactions," transactions that are subject to the list maintenance requirements of Internal Revenue Code § 6111 because they have the potential for tax avoidance or evasion, listed in I.R.S. regulations or notices.  Each should have been registered as tax shelters pursuant to Internal Revenue Code § 6111(c), but the Defendants and the other members of Defendant's alliance did not register them.

25.     On information and belief, as the I.R.S. listed a specific transaction or a type of transaction being marketed by the Defendants or other members of Defendant's alliance, the members of the alliance, including the defendants, would modify the shelter being marketed by them.  The modifications did not render the revised tax shelters lawful or substantially different from the listed transactions.

26.     On information and belief, under the Defendants' arrangement, the role of

Deutsche Bank included providing financing to enable some persons to participate in tax shelters.  Deutsche Bank's role also included providing a financial facade of economic substance for the financial transactions taxpayers would engage in to generate tax losses. Deutsche Bank's role was to structure the transactions so that they had a semblance of economic substance but, as Deutsche Bank knew, in reality would only generate losses. Deutsche Bank served as the counter party on the numerous transactions engaged in to implement those shelters.  On information and belief, Deutsche Bank was to solicit potential participants in the shelters.

27.     After the Internal Revenue Service issued IRS Notice 1999-59 and Notice 2000-44 and after the Third Circuit issued its ruling in <u>ACM Partnership</u>, Deutsche Bank continued marketing, promoting and participating in these sham, Son-of-Boss tax shelters including ML deposit tax shelter and others that were devised by them as part of the Defendants' arrangement, that fell within the scope of those notices and rulings.  On information and belief, Deutsche Bank used the interstate mail and wire facilities to promote and market these tax shelters, to conduct the transactions called for by the shelters, and to collect fees.

28.     The Defendants' actions described herein pose the threat  of continuing criminal activity, as they have continued their promotion of listed tax shelters even after IRS Notices and court rulings questioning the shelters' legitimacy.

29.     On information and belief, the Defendants' arrangement involved billions of dollars in tax losses, hundred, if not thousands of clients and taxpayers, causing those clients and taxpayers substantial losses and depriving the United States of billions of dollars in tax revenues.

30.     The Defendants intentionally masked their arrangement and activities under the cloak of attorney-client privilege.  They and their fellow participants corresponded and communicated with clients individually so that clients would not know who else was participating in the shelters and could not know the scope of the Defendants' arrangement.

31.     On information and belief, Deutsche Bank officials and employees took steps to make sure that their involvement in marketing and promoting the tax shelters was cloaked under attorney-client privilege.  Deutsche Bank also changed its normal operational procedures to avoid creating an audit trail.

32.     While each of these steps in Defendants' sham tax shelters like the ML deposit strategy was planned by the Defendants in advance as a single transaction designed to reduce the taxpayer's tax liability, the Defendants agreed neither to disclose this to Plaintiffs and class nor to explain the consequences of this fact to Plaintiffs and class.

33.     The Defendants agreed that taxpayers/clients would be advised that because the basis of a taxpayer/client's interest in a partnership would be increased for tax purposes by the purchase cost of long options, but not decreased by the premium earned on the sale of the short options, upon the contribution of the partnership interests to an S corporation and the sale by the S corporation of its capital assets, the S corporation would realize a large loss that could be applied to substantially reduce or eliminate the substantial gain realized by the taxpayer/client on another event and, thus, substantially reduce or eliminate the taxpayer/client's tax liability for that gain.  The Defendants further agreed that taxpayer/clients were to be advised that the amount of loss

to be generated by the ML deposit transaction could be pre-determined by the Defendants.

34.     The Defendants agreed that taxpayer/clients would be told that while the most expected result of a ML deposit transaction was that the loss or gain on the long options would be almost completely offset by the gain or loss on the short options, and vice versa, there was a reasonable chance that the taxpayer would earn a significant profit on the ML deposit transaction.  In fact, Deutsche Bank, as well as the other Defendants, knew (a) that the ML deposit transactions were structured in a way that vested in Deutsche Bank the ability to control whether a profit was earned and how much that profit would be and (b) that Deutsche Bank would exercise its discretion to ensure no profit would be earned.

35.     On information and belief, the Defendants further agreed that prospective participants in the ML deposit transactions and other Son of Boss-like tax shelters would be told that (a) these were a legitimate and lawful tax strategy, (b) ML deposit transactions and other Son of Boss-like tax shelters had been developed for a "select audience" of individual who had generated significant gains or income, and (c) these individuals could take advantage of a legal "loophole" in the tax laws to shield all or most of their income from taxation.

36.     On information and belief, the Defendants further agreed (a) that the lawyers' opinion would be presented in an abbreviated format that did not disclose fully the risks associated with ML deposit transactions and other Son of Boss-like transactions so that prospective participants would be lulled into engaging in ML deposit transactions and other Son of Boss-like transactions, and (b) that the prospective participants would be

told that law firms would issue opinion letters attesting to the legitimacy of ML deposit transactions and other Son of Boss-like transactions and that the opinion letters would protect against the assessment of penalties in the unlikely event the tax authorities challenged tax shelters.

37.     In fact, Deutsche Bank, as well as the other Defendants, knew that the transactions were structured in a way that vested in Deutsche Bank the ability to control whether a profit was earned and how much it would be.  Neither Deutsche Bank nor the other Defendants disclosed this unique structure to Plaintiffs and class and in fact concealed it in their mailings and wire communications, because that might have led clients not to participate in the transaction and sacrifice the substantial fees Defendants would earn on the transactions.  Neither Deutsche Bank nor the other Defendants disclosed to Plaintiffs and class the adverse effect the lack of a realistic chance of earning a profit would or could have on the legitimacy of the ML deposit transactions and other Son of Boss-like transactions and strategies under applicable tax laws.

38.     Had Deutsche Bank or the other Defendants disclosed (a) that there was not a reasonable chance of earning a profit on the ML deposit transaction and other Son of Boss-like transactions, (b) the unique structure of the options transactions, (c) that Deutsche Bank would exercise its discretion to ensure a tax loss, or (d) the adverse effect the lack of a realistic chance of causing a profit had on the legitimacy of the ML deposit transaction and other Son of Boss-like transactions, Plaintiffs would not have participated in the transaction.

39.     The lack of a realistic chance of causing a profit is a fact that renders ML deposit transactions and other Son of Boss-like transactions an abusive tax shelter, according to the IRS.

40.     On information and belief, all Defendants knew that the various law firms that they worked with were using "canned" opinion letters concerning the ML deposit transactions and other Son of Boss-like transactions, and needed only to fill in several blanks for each of the many clients to which they rendered such "opinion letters." The fact that the "opinion letters" were "canned" was not disclosed to Plaintiffs or class.

41.     Deutsche Bank had a financial, business, and proprietary interest in inducing Plaintiffs, as well as the class, to enter into the ML deposit transactions and other Son of Boss-like transactions, and, in doing so, facilitated the ML deposit transactions and other Son of Boss-like transactions while remaining silent and failing to inform Plaintiffs, as well as the class, that the ML deposit transactions and other Son of Boss-like transactions would not provide legitimate tax losses for Plaintiffs or the class. Further, on information and belief, Deutsche Bank knew that Plaintiffs and others, induced to enter into ML deposit transactions and other Son of Boss-like transactions, were being told that there was a reasonable prospect that the ML deposit transactions and other Son of Boss-like transactions would earn a profit and that this prospect was a key factor in the legitimacy of the transactions under the tax laws. Deutsche Bank, as well as the other Defendants, knew, however, that the options transactions were structured in a way that vested in Deutsche Bank the ability to control whether a profit was earned. Neither Deutsche Bank nor the other Defendants disclosed this unique structure to Plaintiffs, as well as the class and in fact concealed it because that might have led clients

not to participate in the transactions and sacrifice the substantial fees Defendants would earn on the transactions.

42.     Mark Hutton is the owner of a construction company based in Wichita, Kansas.  He was advised by Defendant Daniel Brooks, Jr., that Hutton could potentially earn a substantial rate of return by investing in the foreign currency markets.  Defendant Daniel Brooks, Jr. introduced taxpayer/clients, including Mark Hutton, to ML deposit investments.

43.     Defendants caused Mark Hutton to form Clearmeadow Investments, LLC ("Clearmeadow Investments, LLC"), a LLC wholly-owned by Hutton that is treated for federal tax purposes as a disregarded entity.  At the time of formation, Hutton contributed cash to Clearmeadow Investments, LLC.  Clearmeadow Investments, LLC made investments in ML deposit positions.

44.     ML deposits are cash deposits similar to money markets or certificates of deposit.  A ML deposit contains two interest components--(1) a fixed rate of return component that is paid on the maturity date of the ML deposit, and (2) a variable interest component that is paid on the maturity date if certain contingencies occur.  The contingency is determined by reference to a specific financial market measure such as a foreign currency.  Whether the contingency is satisfied is generally not known or determined until the maturity date.

45.     Clearmeadow Investments, LLC entered into a ML deposit transaction, which constituted a deposit of 27,472,520 Eurodollars.  Under the terms of this ML deposit position, on December 14, 2001, Defendant Deutsche Bank would be required to pay to Clearmeadow Investments, LLC an amount equal to the ML deposit

amount plus a fixed yield calculated at an annual rate of 3.67%, plus, a contingent variable yield calculated at an annual rate of 16%.  The variable yield was contingent upon the Japanese Yen/US Dollar spot market equal to or exceeding 124.65 on the maturity date.  Clearmeadow Investments, LLC paid a premium to acquire this position in this ML deposit equal to 2,747,252 Eurodollars.

46.    Clearmeadow Investments, LLC also entered into a short ML deposit position, in which it accepted a deposit of 27,472,520 Eurodollars.  Under the terms of this short ML deposit position, on December 14, 2001, Clearmeadow Investments, LLC was required to pay to the depositor an amount equal to the ML deposit amount plus a fixed yield calculated at an annual rate of 3.67%, plus, a contingent variable yield calculated at an annual rate of 15.82%.  The variable yield was contingent upon the Japanese Yen/US Dollar spot market equal to 124.67 on the maturity date.

47.    Through these separable and distinct ML deposit positions, Clearmeadow Investments, LLC stood to earn a 14,446% return on its ML deposit investments if the Japanese Yen/US dollar spot market was greater than or equal to 124.65 on the maturity date but less than 124.67.  In addition, Plaintiffs, through CLEARMEADOW LLC, would earn a modest investment return if the Japanese Yen/US dollar spot market was greater than or equal to 124.67 on the maturity date.

48.    On October 17, 2001, Mark Hutton transferred his entire ownership interest in Clearmeadow Investments, LLC to a newly formed, wholly-owned S corporation called Clearmeadow Capital Corp.  Clearmeadow Capital Corp. was admitted as a member of Clearmeadow Investments, LLC.  Simultaneously with the transfer of interests in Clearmeadow Investments LLC to the Clearmeadow Capital Corp.,

CF Advisors XXXVII, LLC, contributed cash to Clearmeadow Investments, LLC in exchange for ownership interests.

49.     At the time of contribution, the Clearmeadow Capital Corp. and CF Advisors XXXVII, LLC amended the Clearmeadow Investments, LLC agreement to include a provision, which allows the Corporation to cause CF Advisors to purchase the ownership interests of the Corporation in Clearmeadow Investments, LLC at fair market value or to cause CF Advisors to sell its ownership interests to the Corporation.  The Clearmeadow Capital Corp. exercised this right prior to December 14, 2001, and caused CF Advisors to acquire the Clearmeadow Capital Corp. ownership interests in Clearmeadow Investments, LLC.

50.     On December 14, 2001, the Japanese yen/US exchange rate was equal to 120.05.

51.     Plaintiffs were informed by Defendants that the above stated transaction created a loss that Mark Hutton could recognize on his personal income tax return for the year ending December 31, 2001.

52.     Mark Hutton received an opinion letter from Cantley & Sedeca that falsely advised him that the ML deposit transaction would properly and legally reduce his income tax liability.

53.     None of the Defendants disclosed to Plaintiffs the consequences of the fact that each of the steps in the ML deposit transaction was fully planned as a single transaction designed to reduce the tax liability of Plaintiffs in 2001.

54.     In 2001, Mark Hutton filed a tax return where he claimed a loss in excess of $1,000,000 generated from the ML deposit transaction.

55.     Because of the actions alleged herein by defendants, Plaintiff has been damaged in excess of, **$750,000** in tax, penalties, interest, cost of tax advice, tax attorneys and related damages which are still accruing to this day.

## CLASS ACTION ALLEGATIONS

56.     Plaintiffs bring this action as a class action against the Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and a Class defined as:

> All persons in the United States, who purchased from defendants sham tax shelters such as ML deposit, Son of Boss, OPS, BOSS, BLIPS, MIDCO, FLIPS, OPIS, TRACT, IDV, CARDS, COBRA, other similar Son of Boss tax shelters during the years 1997, 1998, 1999, 2000, 2001, 2002, and 2003.
>
> Excluded from the Class are the Defendants, their subsidiaries, and their employees, officers and directors. "Persons" include any natural person and his/her legal representative, and a partnership, corporation (domestic or foreign), company, trust, business entity or association and the Judge assigned to this action and any member of the Judge's immediate family or staff.

57.     Plaintiffs are members of the Class and will fairly and adequately assert and protect the interests of the Class.  The interests of the Plaintiffs are coincident with, and not antagonistic to, those of other members of the Class.

58.     Plaintiffs have retained attorneys who are experienced in class action litigation.

59.     The members of the Class are so numerous that joinder of all members is impracticable.  Upon information and belief, there are thousands of members of the Class

whose identities can be easily ascertained from the files and records of the Defendants and their subsidiaries.  Plaintiffs and its counsel do not anticipate any difficulties in the management of the action as a class action.

60.    Common questions of law and fact predominate over any questions affecting only individual members of the Class.  Common questions include, inter alia, the following:

a.    Whether Defendants concealed from Plaintiffs and class members that the ML deposit transactions and other Son of Boss-like transactions would not pass muster with the IRS and were entirely sham tax shelters.

b.    Whether Defendants provided misleading and deceptive information to Plaintiff and class members that the ML deposit transactions and other Son of Boss-like transactions were lawful and legitimate tax shelters.

c.    Whether Defendants concealed from Plaintiffs and class members that the legal opinions were canned, untrue, omitted material information that would show the ML deposit transactions and other Son of Boss-like transactions were not legitimate and that the law firms that issued the bogus legal opinions were working with Defendants in promoting these fraudulent tax shelters.

d.    Whether Defendants engaged in conduct as described herein that is immoral, unethical, oppressive, unscrupulous, and/or that violates public policy

e.    Whether defendants were engaged in a RICO enterprise;

f.    Whether the Defendants conduct as described herein should be enjoined.

61.    The prosecution of separate actions by individual members of the Class would create a risk of:

a.      Inconsistent or varying adjudications with respect to individual members

of the Class which would establish incompatible standards of conduct for

Defendants; and

b.      Adjudications with respect to individual members of the Class which

would, as a practical matter, be dispositive of the interests of the other members

not parties to the adjudications or substantially impair or impede their ability to

protect their interests.

62.     A class action is superior to other available methods for the fair and

efficient prosecution of this action.  The certification of a class would allow litigation of

claims that, in view of the expense of the litigation, may be insufficient in amount to

support separate actions.

### JURISDICTION AND VENUE

63.     This Court has jurisdiction over the subject matter of this action pursuant

to (a) 28 U.S.C. 1331 because the RICO claim raises a question of federal jurisdiction;

(b) 28 U.S.C. § 1332 because it exceeds the amount-in-controversy requirement and this

is a suit between citizens of different states; and (c) 28 U.S.C. § 1367 because the

remaining state law claims are so related to the RICO claim that they form part of the

same case or controversy.

64.     The district court of Kansas has personal jurisdiction over all defendants

because defendants committed tortious acts within the state of Kansas.  Defendants

continuously and systematically engaged in business in the state of Kansas and have

agents in Kansas doing business in Kansas.

65.     Venue is proper in this District pursuant to (a) 18 U.S.C. § 1965(a) because the Defendants all are found, reside and/or transact business in this District; (b) 18 U.S.C. § 1965(b) because the ends of justice require that the parties residing in any other district be brought before this Court; (c) 28 U.S.C. § 1391(a) and 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this District; and (d) 28 U.S.C. § 1391(a)-(b) because one or more Defendants is found in and subject to personal jurisdiction in this district.

## COUNT I
### (violations of state Deceptive Trade Practices Act)

66.     Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

67.     At all relevant times, by virtue of its misrepresentations, concealment, and deceptive trade practices, Defendants represented to Plaintiffs and class that the ML deposit transactions and other Son of Boss-like transactions were lawful and legitimate tax planning strategies.

68.     At all relevant times, Defendants either knew or should have known from the outset that the ML deposit strategy and other Son of Boss-like transactions would not pass muster with the IRS and were entirely sham tax shelters.

69.     Defendants, through employees, agents and representatives, committed acts or practices which were actionable under the Deceptive Trade Practices Acts of Kansas, Colorado, New York, Connecticut and/or the other states for one or more of the following reasons:

a.      Concealing from Plaintiffs and class members that the ML deposit transactions and other Son of Boss-like transactions would not pass muster with the IRS and were entirely sham tax shelters;

b.      Providing misleading and deceptive information to Plaintiffs and class members that the ML deposit transactions and other Son of Boss-like transactions were lawful and legitimate tax shelters;

c.      Concealing from Plaintiffs and class members that the legal opinions were canned, untrue, omitted material information that would show the ML deposit transactions and other Son of Boss-like transactions were not legitimate and that the law firms that issued the bogus legal opinions were working with Defendants in promoting these fraudulent tax shelters;  or

d.      Engaging in conduct as described herein that is immoral, unethical, oppressive, unscrupulous, and/or that violates public policy.

70.    Defendants' unfair conduct, as alleged in the preceding paragraph, was material to Plaintiffs' and class members' decisions to purchase the ML deposit transaction and other Son of Boss-like transactions.

71.    Defendants intended that Plaintiffs and class members rely upon Defendants' unfair and unlawful acts and practices, and Plaintiffs and class members were actually deceived by Defendants' deceptive trade practices as described more fully herein.

72.    Defendants' unfair acts or practices occurred in connection with Defendant's conduct of trade and commerce.

73.     Defendant's unfair acts and/or practices violate, without limitation, the

Deceptive Trade Practices Acts of Kansas, Colorado, New York, Connecticut as well as

consumer protection statutes throughout the county.

74.     As a direct and proximate result of Defendants' unfair acts and/or

practices, Plaintiffs and class members have been damaged.

## COUNT II
## (RICO --- Against All Defendants)

75.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

76.     The Defendants' arrangement described herein constitutes an ongoing

organization, with an ascertainable structure and purpose beyond the predicate acts and

the conspiracy to commit such acts, by which the Defendants function as a continuing

unit comprised of said Defendants.

77.     Defendants associated themselves with each other to form an enterprise

(the "Enterprise") for the purpose of promoting and selling various tax schemes for many

millions of dollars.  Defendants knew that many of these tax schemes, including the ML

deposit transaction and other Son of Boss-like transactions, were likely to be challenged

by-the tax authorities and/or contrary to law.  The Enterprise engaged in, and its activities

affected, interstate commerce, including the provision of legal, accounting, tax, and

financial and investment services across state lines.

78.     Defendants conducted or participated in the conduct of the Enterprise's

affairs through a pattern of racketeering activity consisting of, inter alia, more than two

acts of mail fraud and wire fraud (in violation of 18 U.S.C. § 1341 and 1343,

respectively).  As part of this pattern, continuing over the course of years, by using the

mails, private interstate carriers and interstate wire communications, said Defendants,

through their Enterprise, sold these tax schemes to hundreds, in not thousands, of clients, including Mark Hutton.  In particular, without limitation, in violation of 18 U.S.C. § 1341 and 1343, Defendants employed the Postal Service and/or private or commercial interstate carriers and/or interstate wire communications to send their retainer letters, invoices, opinion letters, tax advice, and investment advice to Mark Hutton, Clear Meadow Investment LLC, and over 600 other clients, and to receive from Plaintiffs and many-other clients payments of Defendants' invoices, all as set forth above.

79.     Each Defendant's conduct as set forth herein was in concert with each of the other Defendant's conduct, planned and pre-arranged with and known by each of the other said Defendants pursuant to said Defendants' common scheme to sell tax strategies for millions of dollars.

80.     Defendants' conduct of the Enterprise and their pattern of racketeering activity commenced in 1997 or 1998, well before the date when they and other members of their alliance first contacted Mark Hutton in 2001 to solicit his participation in the ML deposit transaction scheme and continues through the present, when the Defendants continue to communicate with Mark Hutton, using interstate mail and wire facilities, but not to reveal and in fact hide the full extent of said Defendants' malpractice and racketeering conduct, and continue to promote tax shelters.

81.     Defendants' conduct of the Enterprise and their pattern of racketeering activity were not limited to the acts involving Plaintiffs but included acts directed to many other clients as well.  On information and belief, Defendants have continued to engage in racketeering activity designed to promote illegal tax shelters, and to disguise

and hide the illegal nature of their prior acts, posing the threat of continuing criminal activity.

82.     On information and belief, Defendants have combined in an Enterprise to sell other illegal tax shelters, activity that spans a longer period of time than the ML deposit transaction scheme; and that poses the threat of continuing criminal activity.

83.     On information and belief; each of the Defendants used and invested income earned from their participation in the Defendants' arrangement in the development and marketing of tax shelters after that received that income.  Thus, for example, income from BOSS and Son-of-Boss was used to promote the ML deposit transaction to the detriment of Plaintiffs.

84.     Defendants' conduct violated 18 U.S.C. § 1962(a), 1962(c) and 1962(d).

85.     As a result of said Defendants' conduct set forth herein, Plaintiffs have suffered injury in their business and property in that (a) they have paid Defendants in excess of $250,000, (b) they have paid or will incur tax penalties and interest in an amount exceeding $200,000, (c) they have had to make tax payments in an amount exceeding $200,000 they were promised they would not have to make, (d) they lost in excess of $100,000 on the ML deposit transaction itself, (e) they have paid and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation, (f) they have foregone legitimate tax savings opportunities and tax deductions, and (g) they were forced to liquidate personal assets at distressed prices to meet their tax obligations.

86.     Mark Hutton and the public are threatened with loss and injury and/or irreparable harm due to Defendants' vio1ation of the RICO laws.

87.     Plaintiffs seek an injunction enjoining Defendants from:

a.     engaging in the same types of conduct or endeavor alleged herein;

b.     devising, offering, and soliciting clients for, or promoting, tax shelters;

c.     preparing tax returns involving tax shelters;

d.     providing legal advice regarding tax shelters;

e.     soliciting clients for, referring clients to, or engaging in marketing or business development programs, with each other;

f.     sharing fees or income with each other;

g.     committing any acts of mail fraud or wire fraud; and

h.     violating the RICO laws.

Plaintiffs also seek an injunction requiring Defendants to:

a.     divest themselves of any interest, direct or indirect, in the Enterprise; and

b.     dissolve the Enterprise.

88.     As a proximate cause of the foregoing, Plaintiffs have been injured in an amount to be proved and, should be awarded treble damages, plus attorneys' fees and costs.

## COUNT III
### (Breach of Fiduciary Duty - Against all defendants)

89.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

90.     Cantley and Sedeca were Plaintiffs' fiduciaries, and thus owed Plaintiffs the duties of honesty, loyalty, care and compliance with the applicable codes of professional responsibility.

91.     By entering into the Defendants' arrangement, Deutsche Bank was constructively charged with the same fiduciary duties that Cantley and Sedeca and other Defendants owed to Plaintiffs.

92.     Because of the discretion regarding the ML deposit transactions and other Son of Boss-like transactions vested in Deutsche Bank, it became a fiduciary of Plaintiffs and class.

93.     Deutsche Bank authorized the other participants in Defendants' arrangement to represent to potential participants in ML deposit transactions and other tax strategies to which Deutsche Bank would be the counterparty, that there was a significant chance of earning a profit on those transactions, and that Deutsche Bank would act to ensure that such a profit might be earned.

94.     Plaintiffs placed trust and confidence in Deutsche Bank, that it would exercise the options' in a way that would give economic substance to them and ensure the prospect of profits.

95.     Defendants breached their duties to Plaintiffs by promoting the ML deposit transaction and other Son of Boss-like transactions; by making false representations; by failing to disclose material or significant facts and the effects of those facts and misrepresentations; by advising Plaintiffs to engage in and complete the ML deposit transactions; by advising Plaintiffs that the cost of the currency long option purchased by them in the ML deposit transaction could properly be included in their tax

basis for computing capital losses for 2001, but that the amounts received for selling the currency short option could be ignored so that Mark Hutton included the cost of the currency long option, but not the premiums received for the currency short option, in his tax basis for computing losses on his federal and Kansas 2001 tax returns; by advising Mark Hutton that it would be lawful and proper to sign and file the tax returns prepared in accordance with their Opinion Letters and as they were prepared by a reputable lawfirm;  by advising the Plaintiffs that there was a reasonable chance that the ML deposit transactions would generate a profit; by failing to advise the Plaintiffs that the unique structure of the ML deposit transactions meant that Deutsche Bank controlled whether that profit would be earned and its amount; and by failing to disclose that the Defendants had a conflict of interest in exercising that discretion, all of which advice and omissions said Defendants knew or should have known to be improper, for the sole purpose of generating huge fees for Defendants.

96.     As a proximate cause of the foregoing, Plaintiffs have been injured in an amount to be proved and should be awarded punitive damages of $100 million.

## COUNT IV
### (Inducing Breach of Fiduciary Duty - Against Deutsche Bank)

97.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

98.     Deutsche Bank knew that Cantley & Sedeca owed Plaintiffs the duties of honesty, loyalty, care, and compliance with the applicable codes of professional responsibility.

99.     Deutsche Bank knew that the other Defendants breached their duties to Plaintiffs by promoting the ML deposit transaction and other Son of Boss-like transactions and advising Plaintiffs to engage in the ML deposit transaction.

100.     Deutsche Bank knew or should have known that the other Defendants were acting as unregistered promoters of tax shelters and concealed that fact and its implications from Mark Hutton and other customers in order to obtain large fees from them.

101.     Deutsche Bank induced and participated in these fiduciary breaches by providing the facilities for and acting as the counterparty in the currency options transactions, by providing substantial assistance to and playing a substantial role in the Defendants' arrangement, and by remaining silent and failing to inform Plaintiffs that the ML deposit transaction would not provide Plaintiffs with legitimate tax losses, or with any reasonable prospect of profits, which Deutsche Bank knew was an expectation that Plaintiffs had.

102.     As a proximate cause of the foregoing, Plaintiffs have been injured in an amount to be proved, and should be awarded punitive damage.

## COUNT V
### (<u>Fraud - <u>Against</u> <u>All</u> <u>Defendants</u></u>)

103.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

104.     Each Defendant is liable for the misrepresentations and omissions made by each of the other Defendants as a principal and co-conspirator.

105.     In order to induce Mark Hutton to pay them in excess of $250,000 in fees, Defendants made numerous knowingly and false affirmative representations and intentional omissions of material fact to Mark Hutton, as set forth, supra, and including (1) stating that the so-called ML deposit transaction, under which a taxpayer/client simultaneously purchases and sells ML deposits, contributes them to a partnership, and takes various other steps as set forth above, entitles the taxpayer/client to include the cost

of the long options purchased in his basis for calculating capital losses while ignoring the premiums received for the short options, thus offsetting capital gains realized in unrelated transactions; (2) failing to disclose that the ML deposit transaction was not legitimate and that existing published authority, including Notices published by the IRS and court decisions, meant that purported losses arising from such transactions as the ML deposit transaction and other Son of Boss-like transactions were not properly allowable for tax purposes; (3) failing to disclose that if Mark Hutton filed tax returns claiming losses based on the ML deposit transaction, he would be liable for penalties and interest and that the "Opinion Letters" provided by the Defendants would not protect Mark Hutton from penalties, (4) failing to promptly advise Mark Hutton to amend his returns, (5) making and endorsing the statements contained m the Opinion Letters signed by Cantley & Sedaca, Jenkens & Gilchrist and Brown & Wood; (6) making and endorsing the statements contained in their oral advice and the 2001 tax returns prepared in accordance with their Opinion Letters; (8) Defendants' statements that there was a reasonable prospect that Mark Hutton would earn a profit on the ML deposit transaction; and/or (9) failing to disclose that Deutsche Bank controlled whether a profit would be earned and the amount of any profit.

106.    The above affirmative representations and omissions made by each Defendant were false, misleading, and material when made or omitted and said Defendants knew these representations and omissions to be false, misleading, and material when made or omitted with the intention that Mark Hutton would rely upon them in entering into the ML deposit transaction and pay them in excess of $250,000 in fees.

107.   In reasonable reliance on said Defendants' false representations and misleading omissions regarding the ML deposit transaction, Mark Hutton paid over $250,000 to Defendants for tax and legal advice and to execute the ML deposit transaction, did not avail themselves of legitimate tax savings opportunities and deductions, filed federal and state tax returns in 2001 that reflected deductions for losses resulting from the ML deposit transactions and the Defendants' fees and did not promptly amend those tax returns, thereby incurring over $200,000 in penalties and interest and over $200,000 in additional taxes, as well as other expenses.  But for Defendants' intentional misrepresentations and material omissions described above, Mark Hutton would never have hired Defendants for advice on the ML deposit transaction, engaged in the ML deposit transactions, claimed the purportedly resulting losses on their income tax returns, or filed and signed their 2001 tax returns prepared in accordance with their Opinion Letters or in reliance Defendants' advice, failed to promptly amend said returns, and failed to avail themselves of legitimate tax savings opportunities and deductions.

108.   After discovering said Defendants' fraud, Plaintiffs incurred and will continue to incur substantial additional costs in hiring new tax and legal advisors to rectify the situation.

109.   As a proximate cause of the foregoing, Mark Hutton has been injured in an amount to be proved but believed to be at least $750,000, and should be awarded punitive damages of $100 million.

## COUNT VI
### (Negligent Misrepresentation
### -Against All Defendants)

110.   Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

111.     Defendants had actual knowledge that the ML deposit transaction and other Son of Boss transactions were not legitimate tax shelters and were in fact entirely bogus.

112.     Defendants intentionally or negligently omitted this information that the ML deposit transaction and other Son of Boss transactions were not legitimate tax shelters and were in fact entirely bogus

113.     Defendants' intentional omissions were made willfully, wantonly, or recklessly to Plaintiffs to induce the purchase of the ML deposit transaction and other Son of Boss transactions.

114.     In reasonable reliance on said Defendants' false and/or negligent representations and misleading omissions regarding the ML deposit transaction, Mark Hutton paid over $250,000 to Defendants for tax and legal advice and to execute the ML deposit transaction, did not avail themselves of legitimate tax savings opportunities and deductions, filed federal and state tax returns in 2001 that reflected deductions for losses resulting from the ML deposit transactions and the Defendants' fees and did not promptly amend those tax returns, thereby incurring over $200,000 in penalties and interest and over $200,000 in additional taxes, as well as other expenses.  But for Defendants' intentional and/or negligent misrepresentations and material omissions described above, Mark Hutton would never have hired Defendants for advice on the ML deposit transaction, engaged in the ML deposit transactions, claimed the purportedly resulting losses on their income tax returns, or filed and signed their 2001 tax returns prepared in accordance with their Opinion Letters or in reliance Defendants' advice, failed to

promptly amend said returns, and failed to avail themselves of legitimate tax savings opportunities and deductions.

115.    As a proximate cause of the foregoing, Mark Hutton has been injured in an amount to be proved but believed to be at least $750,000, and should be awarded punitive damages of $100 million.

## COUNT VII
### (Civil Conspiracy
### -Against All Defendants)

116.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

117.    As described more fully herein, the defendants knowingly acted in concert to market and implement the fraudulent and illegal ML deposit transaction and other Son of Boss tax shelter transaction.  In doing so, the defendants acted with full knowledge and awareness that the transaction was designed to give the false impression that a complex series of financial transactions were legitimate business transactions which had economic substance from an investment standpoint when in fact they lacked those features (which was necessary for successful tax strategy).

118.    The defendants acted in their respective roles as described above according to a predetermined and commonly understood accepted plan of action (i.e. the Defendants' arrangement), all for the purposes of obtaining professional fees from plaintiffs and class members.

119.    The acts of defendants were contrary to numerous provisions of law, as stated above.

120.     There was a meeting of the minds between among the defendants, and other individuals and entities, both known and unknown, to commit the unlawful acts alleged herein.  This conspiracy to commit these unlawful, overt acts proximately caused and continues to cause plaintiffs and the class members damages as previously set forth herein.

121.     As a proximate cause of the foregoing, Mark Hutton has been injured in an amount to be proved but believed to be at least $750,000, and should be awarded punitive damages of $100 million.

## COUNT VIII
### (Declaratory judgment - Against All Defendants)

122.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

123.     The IRS and the Kansas tax authorities have audited Plaintiffs' 2001 returns.  Mark Hutton has paid interest and/or penalties, assessed by the IRS and Kansas authorities, totaling over $200,000 and owe additional such amounts, as a consequence of Mark Hutton engaging in the ML deposit transactions, as advised by the Defendants, and have paid, and will incur, additional professional fees to rectify said Defendants' wrongdoing, in the amount exceeding $250,000.

124.     The IRS and the Kansas tax authorities have audited the 2001 and 2002 tax returns of the Plaintiffs.

125.     Mark Hutton and/or those of the entities created to engage in the ML deposit transaction are threatened with additional assessments of interest and penalties, as a consequence of Mark Hutton engaging in the ML deposit transactions, as

advised by the Defendants, and have paid and will incur additional professional fees to rectify said Defendants' wrongdoing, in an amount in excess of $250,000.

126.    Defendants are legally responsible for such interest and/or penalties and or professional fees incurred by Mark Hutton on account of said Defendants' violation of RICO, breach of fiduciary duty, inducing breach of fiduciary duty, fraud, negligent misrepresentation, malpractice, and breach of contract, as set forth above.

127.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants are liable to Plaintiffs for such damages that have been and will be incurred and that such damages should be trebled under RICO.

### COUNT IV
### (Restitution Or Recoupment Of Unethical, Excessive, Illegal and Unreasonable Fees and Unjust Enrichment – Against All Defendants)

128.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

129.    Irrespective of the merits of the Opinion Letter that Cantley & Sedeca rendered to Mark Hutton, the $250,000 fee that the Defendants charged Mark Hutton and which Mark Hutton paid, is unethically excessive in violation of, and invalid and unenforceable under the rules of professional conduct of Missouri, Kansas, Colorado, and New York.  Further, the Defendants charged many other clients the same or similar fees for the same service and expended little, if any, additional time or effort in providing an Opinion Letter and advice to Mark Hutton.

130.    Further, since Defendants and Cantley & Sedeca did not disclose information that they were required to disclose, such as that they were promoting the ML deposit transaction and other Son of Boss-like transactions, that they had a significant pecuniary interest in the ML deposit transaction and other Son of Boss-like transactions,

that there was a significant risk that their role in promoting the ML deposit transaction and other Son of Boss-like transactions would extinguish any attorney-client privilege, and that their representation of Mark Hutton and their arrangement with the other Defendants violated their fee agreement, such agreements are invalid and unenforceable.

131.    Further, the legal services provided by Cantley & Sedeca have no value and, as measured by quantum meruit, Cantley & Sedeca would have earned and collected nothing for the services they provided.

132.    The Defendants have been unjustly enriched by the collection of fees from Mark Hutton in that they benefited, at Plaintiffs' expense, by collecting fees that were excessive, unreasonable and improper.  Equity and good conscience demand the return of those fees.

133.    Accordingly, Plaintiffs are entitled to revocation of the agreement to pay the Defendants and Canltey & Sedeca $250,000 and are entitled to restitution or recoupment of the amount from the Defendants, who must disgorge those fees to Mark Hutton.

134.    Irrespective of the merits of the Opinion Letter that Cantley & Sedeca rendered to Mark Hutton, the fee charged to Mark Hutton and which Mark Hutton paid, is unethically excessive in violation of, and invalid and unenforceable under Disciplinary Rule 2-106 of the New York Code of Professional Responsibility and the Missouri, Colorado, and Kansas Rules of Professional Conduct.  On information and belief, Cantley & Sedeca and the Defendants charged many other clients the same or higher fees for the same work and expended little, if any, additional time or effort in providing an Opinion Letter and advice to Mark Hutton.

135.    Further, since the Defendants and Cantely & Sedeca did not disclose information that they were required to disclose, such as that they were promoting the ML deposit transaction and other Son of Boss-like transactions, they had a significant pecuniary interest in the ML deposit transaction and other Son of Boss-like transactions, that there was a significant risk that their role in promoting the ML deposit transaction and other Son of Boss-like transactions would extinguish any attorney-client privilege, and that their representation of Mark Hutton and their arrangement with the other Defendants violated the applicable rules of professional conduct and standard of care, the fee agreement with Mark Hutton is not enforceable.

136.    The Defendants have been unjustly enriched by the collection of fees from Mark Hutton in that they benefited, at Plaintiffs' expense, by collecting fees that were excessive, unreasonable and improper.  Equity and good conscience demand the return of those fees.

137.    Accordingly, Plaintiffs are entitled to rescind the agreement to pay fees and are entitled to restitution or recoupment of that amount from the Defendants who must disgorge those fees to Mark Hutton.

138.    Deutsche Bank never disclosed that it and the other Defendants were promoting the ML deposit transaction and other Son of Boss-like transactions, that the fees it would earn were charged on transactions that were structured in a way to provide Deutsche Bank with discretion as to whether a profit would be earned, that Deutsche Bank had a conflict of interest in exercising that discretion and that it would and did exercise that discretion so that a profit was not earned.  Irrespective of the services

Deutsch Bank rendered, the fees it received were excessive since any chance for profit was controlled by the bank which acted to prevent any profit from being earned.

139.    The fees charged by Deutsche Bank were invalid and unreasonable and Mark Hutton is entitled to rescission of their agreement to pay those fees.

140.    Deutsche Bank was unjustly enriched by their receipt of the fees paid by Mark Hutton.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class state that they have been damaged, for which damage they demand judgment in their favor and against Defendants and pray for an Order of the Court ordering the action be maintained as a class action under Fed.R.Civ.P. 23, and the following class be certified:

"All persons in the United States, who purchased from defendants sham tax shelters such as ML deposit, Son of Boss, OPS, BOSS, BLIPS, MIDCO, FLIPS, OPIS, TRACT, IDV, CARDS, COBRA, and other similar Son of Boss tax shelters during the years 1997, 1998, 1999, 2000, 2001, 2002, and 2003.

Plaintiffs and the Class demand judgment awarding Plaintiffs and the Class:

A.      On the first claim (violations of state Deceptive Trade Practices Act), damages in an amount to be proved, but believed to be at least $750,000, plus other such damages recognizable under the state Deceptive Trade Practices Act;

B.      On the Second Claim (RICO), damages in an amount to be proved, but believed to be at least $750,000, trebled to at least $2,250,000 plus attorneys' fees and costs; an injunction enjoining Defendants from (1) engaging in the same types of conduct or endeavor alleged herein; (2) devising, offering, and soliciting clients for, or promoting,

tax shelters; (3) preparing tax returns involving tax shelters, (4) providing legal advice regarding tax shelters, (5) soliciting clients for, referring clients to, or engaging in marketing or business development programs, with each other; (6) sharing fees or income with each other; (7) committing any acts of mail fraud or wire fraud; and (8) violating the RICO laws; and an order (a) requiring Defendants to divest themselves of any interest, direct or indirect, in the Enterprise, and (b) dissolving the Enterprise.

C.      On the Third Claim (Breach of Fiduciary Duty), damages in an amount to be proved, but believed to be at least $750,000, plus punitive damages in the amount of $100,000,000.

C.      On the Fourth Claim (Inducing Breach of Fiduciary Duty), damages in an amount to be proved, but believed to be at least $750,000 plus punitive damages equal to $100,000,000.

D.      On the Fifth Claim (Fraud), damages in an amount to be proved, but believed to be at least $750,000, plus punitive damages in the amount of $100,000,000.

E.      On the Sixth Claim (Negligent Misrepresentation), damages in an amount to be proved, but believed to be at least $750,000.

F.      On the Seventh Claim (Conspiracy), damages in an amount to be proved, but believed to be at least $750,000.

G.      On the Eighth Claim (Declaratory Judgment), a declaration that (1) Defendants are liable to Plaintiffs for any and all taxes, interest, and penalties assessed in the past or future against them by the IRS and/or state tax authorities resulting from Plaintiffs' participation in the ML deposit transactions, for the money that Plaintiffs lost on the actual ML deposit transactions, for all professional fees incurred by Plaintiffs in

the past or the future to rectify Defendants' wrongdoing, such amounts to be trebled under RICO.

      H.     On the Ninth Claim (Unethical, Excessive and Illegal Fees), disgorgement by the Defendants of their fees in the amount of $250,000, plus attorneys' fees, costs, disbursements, interest, and such other and further relief as the Court may deem just and proper.

      I.     Such additional relief as the Court finds just and proper in the premises.

 

Bartimus, Frickleton, Roberson, & Gorny, P.C.

By:   \s\ Stephen Gorny          
Stephen M. Gorny
11150 Overbrook Drive, Suite 200
Leawood, KS 66211
Telephone: 913.266.2300
Facsimile: 913.266.2366

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing was served upon the parties to be electronically served on this 24th day of August, 2007:

<u>    \s\ Stephen Gorny</u>